THE NEW YORK LIFE INSURANCE COMPANY

*v.*

PATRICK H. GILHOOLY.

[Filed November 19th, 1900.]

1. A purchaser in resisting a claim for specific performance of a contract for the purchase of land, is entitled to show by parol evidence or otherwise, circumstances making it unconscionable or unjust to grant this relief which is purely equitable and which entitles him to insist that the vendor must be left to his remedy at law on the contract.

2. Where no title whatever can be given, a court of equity does not consider itself obliged to give to a vendor the equitable relief of specific performance, merely because of the express stipulation of the purchaser that there would be no objection to the title. The control of the court over one of its own special and peculiar remedies upon a contract cannot be thus restricted by a mere agreement of parties.

Heard on bill, answer, replication and proofs taken orally.

*Mr. John J. Hubbell,* for the complainant.

*Mr. Frank Bergen,* for the defendant.

EMERY, V. C.

This is a bill filed by the vendor for specific performance of a written agreement for the purchase of lands. The lands are situate in the city of Elizabeth, and the agreement originally embraced three lots, two of which have been conveyed to the defendant and paid for, and the present controversy arises in reference to the third lot. This lot is described in the agreement as fronting sixty-five feet eight inches on Westfield avenue, and about one hundred and ninety-five feet in depth, and as running toward the east to a lane which constitutes the easterly boundary.

Westfield avenue is a public highway, laid out about 1869.

Defendant sets up in his answer, and the proofs in the case sufficiently show, that the complainant has not a good title to the front portion of this lot for a distance of about twenty feet south from the southerly line of Westfield avenue, and that the title to this front is in other persons. This front portion of the lot was sold on August 4th, 1883, to one Jonathan H. Crane, by the sheriff of Union county, under an execution in foreclosure proceedings, in which the complainant and others were defendants, and the deed made upon this sale under execution and decree, in a cause to which complainant was a party, and the recitals therein that all of the complainant's interest in the tract was sold, is sufficient *prima facie* evidence under the statute (*Gen. Stat. p. 2982 § 14*), that the complainant has no valid title to the front of the lot.

Its interest in this portion, if it has any, is by a possession which has not yet ripened into a title. The want of title to the front of the lot was not denied at the argument, nor a further inquiry as to the title applied for, neither is it contended that the defect in title is so immaterial that specific performance could be granted, if the defendant was, under the provisions of the agreement, entitled to require a good title to this part of the lot. The position of the complainant is that under the agreement, notwithstanding this defect in title to the front of the lot, it is entitled to specific performance by reason of the express provisions in the agreement as to its title to this portion. The agreement dated March 5th, 1897 (set out in full in the bill), for the sum of $4,500, agrees to convey the three lots, particularly describing them as

"beginning at a point in the southerly line of Westfield avenue three hundred and thirty-five feet six inches easterly from the easterly line of Cherry street, thence along the said line of Westfield avenue sixty-five feet eight inches to a lane,"

and thence along the westerly side of the lane, by two courses, together about two hundred feet, the rear of the lot being one hundred feet in width.

At the end of the description occurs the clause

"Excepting and reserving from the last-mentioned piece all that portion of the said lot which has been or is to be appropriated in the changes made in the widening or otherwise changing the lines of Golden Lane or street. It being particularly stipulated and agreed by and between the parties hereto, that this contract is entered into with the perfect knowledge of the party of the second part affecting the interests of the party of the first part, of, in and to the gore, piece or plot now constituting the front of the said lot, and as to that the said party of the first part contracts merely for the conveyance of all its right, title and interest."

By the further provisions of the agreement, however, the deed was to be a proper deed with the covenants only against the grantor's acts for conveying the fee-simple of the premises, free from all encumbrances except taxes, &c., and the following important provision occurs subsequently and at the end of the agreement:

"In case any valid defect to the title is found and the same is rejected therefor by the purchaser, then this contract shall become void and the said sum of $100 (the deposit paid) shall be returned with interest."

This subsequent provision of the agreement was not called to my attention at the hearing or by the briefs, but I think it has a decisive importance in the case.

At the time of the execution of the agreement it was known to the complainant and to the purchaser (a Mr. Isham, who was using defendant's name in the transaction by his consent), that there was a discrepancy of about seven or eight feet between the frontage on Westfield avenue, as described in the deed (sixty-five feet eight inches), and the actual frontage as shown on the ground, which was about fifty-eight feet. Golden street or Mill Lane, as it was called, at this point extended at Westfield avenue apparently seven or eight feet over the easterly line of the lot as described. This lane at this point (as appears by the evidence) had been used as a highway, from the time of the laying out of Westfield avenue (before 1870) and a gore of the lot in question fronting seven or eight feet on the avenue and running back about ninety feet and marked on its westerly side by an old fence or the remains thereof, had thus been apparently thrown into or taken for a public street. Mr. Isham, in negotiating for the lot, knew of this gore or discrepancy in the

frontage and made his offer to purchase, as he says, on this basis. The dealings were carried on by a Mr. Noyes, a real estate agent who had received from the complainant a list of its property in Elizabeth, for sale with prices, for the purpose of submitting offers to the complainant. Noyes also says in the dealings that he knew of no other defect than this discrepancy in the frontage. Noyes went to New York with the $100 deposit which he received from Isham, and there signed the agreement, in defendant's name, without having previously submitted it to him or Isham, and Noyes says that he was not informed by the complainant of any other defect and knew of none. When the agreement thus signed by Noyes, without previous submission, was presented to Isham, he inquired of Noyes as to the meaning of the clause relating to the third lot, and was told by Noyes that it was added to show that there was a discrepancy in the frontage.

Both Isham and Noyes swear positively that they knew nothing about any other defect or trouble in the title, and their evidence is confirmed by Noyes' letter to the complainant, dated March 4th, 1897, in which he offers $4,500 for the properties and adds "and I take this with the knowledge of a discrepancy existing in the Westfield avenue property." Upon the whole evidence I am satisfied that the purchaser, at the time of executing this agreement, or to speak more accurately, at the time of adopting its execution by Noyes as his agent, did not in fact know of the defect in title to the entire frontage and did not contract with this in view. If, therefore, the present controversy is to be decided upon the *status* of the parties based merely on the rights resulting from the execution of the original agreement, the vendor would not, I think, be entitled to a specific performance. The failure of title to the front of the lot would render the specific performance of the contract inequitable. A purchaser in resisting a claim for specific performance of the contract is entitled to show, by parol evidence or otherwise, circumstances making it unconscionable or unjust to grant this relief, which is purely equitable, and which entitle him to insist that the vendor must be left to his remedy at law on the contract. The question in the case as to the complainant's right to specific per-

formance arises, however, from the subsequent dealings between the purchaser and complainant after the purchaser had ascertained the defect in title to the frontage.

On April 5th, 1897, the day appointed for the execution of the contract, Mr. Isham requested a postponement until April 12th, 1897, for the purpose of completing his searches, and the execution was thus postponed at his request, and on his paying $1,000. Mr. Isham signed this extension in defendant's name and as his attorney. By April 12th Isham had been informed of the defective title to the whole frontage and then called the attention of complainant's officers to it, and also informed them that a Mr. Potter had secured from the owner of the frontage an option to purchase it, running for six months. Isham at that time offered to carry out the purchase of the other two lots at the sum of $2,000, which was the amount both parties seem to have fixed for these two lots in the negotiations preceding the written contract. On April 15th Mr. Isham and complainant's officer, Mr. Randall, did agree upon a delivery of the deed for these two properties for $2,000, and Mr. Randall then presented to Mr. Isham for signature an agreement as to the purchase of the third lot. This agreement contained the same terms as the original agreement in reference to the reservations and title and expressly superseded the original agreement. Mr. Isham declined to sign this draft, but offered to sign an extension of the original agreement, and this was finally signed by him in the following terms, endorsed on the agreement:

"At my request, and in consideration of the sum of $100, by me paid to the New York Life Insurance Company, they have consented to an adjournment of the closing of the title to premises situate in the southerly line of Westfield avenue three hundred and thirty-five feet six inches east of Cherry street, described in a contract for sale of the said premises, with other property, bearing date the fifth day of March, 1897, made by the New York Life Insurance Company to Charles W. Noyes, of Elizabeth, New Jersey, agent of Patrick H. Gilhooly, to Tuesday, October 12th, 1897, at the same time and place; all stipulations and agreements in the said contract contained to remain in full force and effect; and I hereby signify my consent thereto. Dated New York, April 12th, 1897.

"PATRICK H. GILHOOLY,
"By H. H. ISHAM, *Atty.*"

New York Life Ins. Co. *v.* Gilhooly.

Mr. Isham says that at this interview he declined to take the third lot unless the company would secure the title to the front of the lot, and that the extension of six months was made in order that they might obtain the title, it being supposed or suggested that Potter would not exercise his option. In reference to executing an extension of the old contract as to the third lot rather than executing a new contract, Mr. Isham says, that looking at the new contract and seeing that it contained the same clause in regard to the front, as shown on the old contract, he refused to execute it, saying,

"I would not execute any new contract. The old contract might be extended upon the same terms and conditions and with the same understanding that I had in regard to the frontage when I agreed to buy it."

Again he says, when asked what took place at this request to sign another contract,

"I simply declined to do it. I said that I would continue the original contract with the understanding I had at the time I accepted it, and no other, and that was settled before I took the deed as to the first two pieces."

This conversation was with Mr. Randall and Mr McCall, neither of whom were examined in reference to the conversation as given by Mr. Isham. The entire evidence as to the situation of the parties to the agreement at the time of the execution of the extension which is the agreemnt now sought to be enforced, shows the situation to be this: The purchaser, at the time of signing the extension, had knowledge of the defect of title to the frontage but supposed that by signing an extension of the original contract, he still had the benefit of any objection to carrying out the contract that he would have had originally, and that this extension, after knowledge of defects, did not deprive him of this right under the contract which was adopted without this knowledge.

This view of his rights, under the extension as signed, so far at least as those rights depend upon the construction of the extension as signed, was not, in my judgment, a correct one. The extension, as signed on April 12th, should, I think, be con-

strued as adopting the stipulations on that date, as if they were
then inserted, and as the purchaser then did in fact know of the
defect in title and then made the extension in view of this
knowledge, his equitable situation, in this respect, would be
essentially changed from that occupied at the signing of the
first agreement. If this construction is correct, defendant has
then lost the right to resist specific performance, so far as it is
based on ignorance of defective title. But the decision of the
case will not be rested upon this point, as there are in the case
other features which I think clearly lead to a denial of the right
to specific performance. The *first* is that the contract itself does
not clearly deprive the defendant of the right to refuse to take
conveyance, if the title is defective. On the contrary, the last
clause of the agreement expressly provides that in case any valid
defect to the title is found, and the same is rejected therefor by
the purchaser, then this contract shall become void, &c. The
exercise of this right is not qualified or restricted in any manner
or to any portion of the third lot, and inasmuch as the clause
at the end of the description does not in terms declare that the
company has no title to the front, it cannot of itself, and as a
mere matter of the construction of a written document, have the
effect of limiting the operation of the third clause to the front
of the lot. In equity at least, and so far as relates to the
equitable relief of specific performance, the two provisions admit
of a construction together which is not repugnant. The reserva-
tion clause would prevent the purchaser, if he asked specific per-
formance, from requiring a conveyance in fee of the reserved
portion or a conveyance of any more than the company's interest
therein, or from asking compensation from the agreed price,
because of defective title to the frontage. This, as it seems to
me, is the full extent and effect of the words which have been
used on this reservation, and inasmuch as this clause does not
clearly override the absolute right of rejection subsequently
given in the agreement, I conclude that the agreement to accept
an invalid title is not so clearly apparent from the agreement
that a court of equity can say it should be enforced. The general
rule is that such stipulations excluding the vendee from his
right to have a good title must do so by clear and explicit words.

*In re Banister, 12 Ch. Div. 131 (Court of Appeals, 1879), Fry, J. (at p. 136).* That has not been done in my judgment by the written agreement in this case, and if resort can be had to the parol evidence as to what took place at the execution of the extension, the evidence of the purchaser, which is uncontradicted, shows that the company consented to the extension in order that they might perfect the title.

This parol evidence, so far as it goes or is competent on this hearing, confirms the view of the construction of the instrument, which I draw from the paper itself.

The *second* reason for denying relief is that I am satisfied upon the entire evidence, that on the part of the purchaser, at least, the agreement to pay $2,500 for the third lot was based on his expectation of getting a title to the portion of the third lot which fronted on the street, and that the failure of title to the front renders the specific performance of the contract inequitable, and complainant must be left to its remedy at law.

Where no title whatever can be given, a court of equity does not consider itself obliged to give to a vendor the equitable relief of specific performance, merely because of the express stipulation of the purchaser that there should be no objection to the title.

The control of the court over one of its own special and peculiar remedies upon a contract cannot be thus restricted or hampered by a mere agreement of parties. In a late leading case in the court of appeal, *In re Scott and Alvarez Contracts, 2 Ch. 603 (1895),* the purchaser bought under a strict condition of sale that he should not make any objection to a certain part of the title. A vital defect was afterwards discovered in this part of the title, against which the purchaser, if he took possession, would have no defence. The court of appeal held that the contract was effective at law and prevented the recovery of the deposit money, but that the court of equity would not force on a purchaser a title so defective that he could not hold possession, even though he had stipulated not to object to the title, and would in such inequitable conditions leave the vendor to his remedy at law on the contract. The defective title in the present case does not, it is true, extend to the whole lot, but without the frontage on the street, the value of the entire lot is so

seriously affected that, in my judgment, the contract should not be enforced and the complainant must be left to its remedy at law.

A decree dismissing the bill will be advised.