ROLAND I. HANNA ET UX. *v.* JAMES M.
BAUGUESS ET AL.

[No. 1080, September Term, 1980.]

*Decided June 4, 1981.*

The cause was argued before MOORE, MELVIN and MASON, JJ.

*Philip V. Tamburello,* for appellants.

*Harry S. Shapiro,* with whom was *Marc H. Baer,* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

The appellants-lessees of real property improved by a furniture store sought specific performance by the appellee-lessor of an option in the lease which gave the lessees the right to purchase at the expiration of the fifth year. The option provided for a purchase price "arrived at by three independent realty appraisors [*sic*]." Finding uncertainty with respect to the determination of the price and the method of selection of the appraisers, the chancellor denied specific performance. We hold that specific performance should have been granted and shall reverse. We shall also vacate a judgment in the amount of $28,800 which was awarded to the appellee-lessor for unpaid rent subsequent to the date of the lessees' exercise of the option.

I

On April 6, 1973, James M. Bauguess, the appellee-lessor, and his former wife, Wanda,[1] entered into a lease agreement with Roland I. Hanna, and his wife, Gail, the appellants-lessees, for the lease of approximately two and one-half acres of land in Jarrettsville, Harford County, Maryland which was improved by a furniture store described as an A-frame block building approximately 120 feet by 60 feet in size.[2] At the time of the execution of the lease, the lessor and his wife were conducting a retail furniture business on the premises.

---

1. Appellee's former wife transferred all her interest in the subject property to the appellee by quit-claim deed in 1975 and is not a party to this appeal.

2. Mr. Bauguess had constructed the store in compliance with a covenant in the deed from his grantor.

The lease was a single page in length, and was prepared by the manager of a local bank. It contained nine numbered paragraphs with few detailed provisions. The term was five years, renewable for another five years. The monthly rental was $1150 for the first year and $1200 thereafter. Paragraph 3 contained the disputed option clause, as follows:

> "3. At the expiration of the fifth year the Lessee may elect to continue payment of $1200.00 rental or exercise his option to purchase above stated property at price arrived at by three independent Realty appraisors [sic]."

The Hannas took exclusive possession of the premises under the lease on June 1, 1973, and began operating the furniture store. It was stipulated below that the rent was paid by the Hannas until the end of May of 1978 (the end of the five-year lease period) and nothing further has been paid since that time. The appellants, however, remain in possession.

Shortly after the Hannas took possession, and presumably in anticipation of purchasing the property pursuant to the option clause, they began making extensive improvements to both the furniture store and the land.[3] Mr. Bauguess testified that consent was given by him for the Hannas to black-top the store's parking lot and nothing more. The Hannas testified, in effect, that it was "understood" that any improvements which increased the value of the property were permissible and that Bauguess made periodic visits to the property at which times he observed and approved the various changes taking place. All of the improvements were completed by approximately September, 1976.

[3] The Hannas, through the work of private contractors, insulated the walls and ceiling, panelled the walls, installed a lighting system, advertising signs, an interior partition wall, six wall air-conditioners, a carpet, and electrical receptacles. They also tiled the bathroom, constructed a new loading dock, black-topped the parking lot, and extended the retail area of the store by enclosing the front porch. With respect to the improvements to the land, they leveled and seeded the front and back yard, and placed a baseball diamond on one end of the property. Several large trees were cut down.

The first mention of the Hannas' election to purchase the property occurred some time in 1976 in a conversation between Mr. Hanna and Mr. Bauguess. The substance of that conversation is disputed but, in any event, counsel for the Hannas notified Mr. Bauguess by certified letter dated February 13, 1978 that the Hannas were exercising their option to purchase the property pursuant to paragraph 3 of the lease.[4] It is undisputed that the appellee received the letter. Prior to the Hannas' election to purchase, Mr. Bauguess had filed lawsuits against them in November, 1976 and July, 1977. The first was an action for waste; the second was for ejectment.[5]

As for their financial ability to purchase the property, the Hannas had contacted a local bank, and its president, James Magness, as early as February 1978, to discuss a mortgage loan. Magness testified that although no formal application was made to the bank, and no loan commitment was given, he was very familiar with the property, the Hannas, and

---

4. The full text of the letter was as follows:

"This is to advise that Mr. and Mrs. Roland I. Hanna are hereby exercising their option to purchase the above described property as provided in said lease and in particular paragraph three thereof.

In as much as the lease does not provide for a purchase price, but does state that the purchase price will be determined by three independent real estate appraisers, I suggest that you select an appraiser, that the Hanna's select an appraiser and that the two appraisers select a third appraiser for the purpose of arriving at a fair market value as of this date.

If you have any further questions regarding this matter, please do not hesitate to contact me.

Yours truly,
/s/ Philip V. Tamburello."

5. On November 23, 1976, Bauguess filed an action for waste against the Hannas in the Circuit Court for Harford County (law case No. 9932). The court (Higinbothom, J.) granted the Hannas' demurrer with leave to the plaintiff to amend. The waste case was stayed, by Order dated January 23, 1980, pending final determination of the instant specific performance suit.

The action of ejectment was filed July 11, 1977 in the District Court for Harford County and subsequently transferred to the Circuit Court. Bauguess sought $2,400.00 for alleged arrearages representing two months unpaid rent. The docket entry states that the Hannas' Motion for Summary Judgment was granted by Order filed on January 23, 1980, and that "Motion to Strike Amended Declaration granted without prejudice, to the right of pltf. to file new Amended Declaration." This confused state of the pleadings is not before us. We do not consider it.

their financial affairs because they had several accounts with the bank, and that financing would be available to the Hannas for the purchase of the property.

Subsequent to the Hannas' election to purchase, Bauguess left Maryland and could not be located. He testified that he was away from approximately April, 1978 to November, 1979. He did not respond to the letter of February 13, 1978, nor did he speak with the Hannas about it. No appraiser was ever appointed by Bauguess. While Bauguess was away, the Hannas, on May 3, 1978, filed the instant suit for specific performance and other relief. They also had the property appraised. The appraiser's report, dated March 15, 1979, stated that the fair market value on February 16, 1978 was $200,000, including the improvements made by the Hannas which he valued at $25,000.

In his answer to the amended bill of complaint, Bauguess admitted that a lease was executed but said that "said Lease was invalid and that it had been altered and modified without the authorization or consent of the Defendant." He denied that there was an option to purchase "since the Lease which created the said option was invalid." Bauguess also filed a cross bill of complaint seeking a monetary decree for unpaid rent, damages for waste, and an injunction to prevent further acts of waste.

In a Memorandum Opinion, dated May 27, 1980, the court dismissed the Hannas' amended bill of complaint and Bauguess' waste claim in the cross bill. With respect to the Hannas' suit for specific performance, the court concluded:

"On the basis of . . . uncertainty in the method of selection of appraisers and the further uncertainty of the determination of the purchase price, this Court finds that the option does not establish the purchase price with sufficient clarity to permit a conclusion that the contract is definite in all its terms."

The court also entered a judgment for Bauguess in the amount of $28,800, representing accrued rent from June 1,

1978 to May 31, 1980. For reasons stated *infra,* we reverse the court's dismissal of the lessees' bill of complaint for specific performance. It necessarily follows that the $28,800 judgment for accrued rent granted in favor of the appellee is vacated.

## II

The primary issue for our consideration is whether the option clause contained in paragraph 3 of the lease is sufficiently certain to permit a court of equity to grant specific performance. For convenient reference, we repeat its provisions:

> "3. At the expiration of the fifth year the Lessee may elect to continue payment of $1200.00 rental or exercise his option to purchase above stated property at *price arrived at by three independent Realty appraisors* [*sic*]." (Emphasis added.).

We begin our analysis with several well-established principles of law dealing with the remedy of specific performance. In *Boyd v. Mercantile-Safe Deposit and Trust Co.,* 28 Md. App. 18, 344 A.2d 148 (1975), Judge Davidson, speaking for this Court, said:

> "The principles applicable to specific performance of contracts relating to the ownership and use of land have been well established in Maryland. The questions of whether specific performance of a contract relating to the ownership and use of land shall be decreed and what shall be the terms of the decree rest within the sound discretion of the equity court. The exercise of the court's discretion, however, must not be arbitrary and is controlled by established principles of equity. Where a contract for the sale of real estate is fair, reasonable and *certain in all of the terms,* it is as much the duty of a court of equity to decree specific performance as

it is for a court of law to award damages for breach of contract." (Emphasis added.) (Footnote omitted.)

*Id.* at 22, 344 A.2d at 152.

With respect to certainty of terms, the cases have held that contracts must be definite and free from all ambiguity. In *Dixon v. Dixon,* 92 Md. 432, 438, 48 A. 152, 153 (1901), the Court observed that the discretion afforded the courts in granting relief by specific performance "is one which is regulated by fixed and established rules. * * * The contract must be definite and certain in its terms and must be free not only from all ambiguity, but likewise free from all shade or color of ambiguity. * * * These terms include . . . the price to be paid. . . ." *Accord, Applestein v. Royal Realty Corp.,* 180 Md. 274, 23 A.2d 684 (1941); *Anshe Sephard Congregation v. Weisblatt,* 170 Md. 390, 185 A. 107 (1936).

Notwithstanding the rather unequivocal pronouncements in the earlier cases, the courts in Maryland and elsewhere have come to interpret this language in a fashion which has permitted specific performance despite the presence of terms which might appear less than "certain." Thus, although price is an essential element in a contract for the conveyance of land, it has been held in this State that specific performance may be granted even though the exact price is not stated, provided the contract defines a method which renders the price readily ascertainable. In *Foard v. Snider,* 205 Md. 435, 109 A.2d 101 (1954), the Court of Appeals quoted approvingly the following language from 1 A. Corbin, *Contracts* § 98 (1963):

"An agreement is not unenforceable for lack of definiteness of price or amount if the parties specify a *practicable method* by which the amount can be determined by the court without any new expression by the parties themselves." (Emphasis added.)

*Id.* at 445, 109 A.2d at 105. Judge Hammond, later Chief Judge, also quoted in *Foard* the language of the *Restatement of Contracts* § 370, which appears in *Trotter v. Lewis,* 185

Md. 528, 45 A.2d 329 (1946), a case involving, in part, the issue of definiteness as to the terms of an option:

> " 'Expressions that at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implications of fact. Apparent difficulties of enforcement due to uncertainty of expression may disappear in the light of courageous common sense.' "

*See also Hagan v. Dundore,* 185 Md. 86, 43 A.2d 181 (1945).

Accordingly, where a contract specifies that the price is to be measured by the "fair market value," "reasonable value" or "current market value," of the services or the property involved, courts have generally held that the price is sufficiently certain in order to have an enforceable obligation. *Miller v. Bloomberg,* 26 Ill. App. 3d 18, 324 N.E.2d 207, 208 (1975) (rehearing denied); *Portnoy v. Brown,* 430 Pa. 401, 243 A.2d 444, 447 (1968); Williston, *Contracts,* Vol. 1, § 41 (3rd ed. 1957); Annot., 2 A.L.R.3d 701 (1965). In *Hagan v. Dundore, supra,* this general trend was recognized in Maryland in the context of a suit for the construction of a partnership agreement and for specific performance where the plaintiff was given an option to purchase defendant's interest in the partnership "for a sum not exceeding the book value of the share of the [appellant]." On this point, the Court of Appeals held:

> "As to the price 'for a sum not exceeding the book value of the share of the said James A. Hagan in said partnership. In the event the said Harry A. Dundore exercises his said option to purchase a part or parts of the interest of James A. Hagan, the sum or sums so paid by him to said James A. Hagan * * *', it is plain that this expression means that when the option is exercised if James A. Hagan will not accept less than the book value of his interest he must accept the full book value of that interest.

Similar expressions have been held certain enough to support specific performance in a number of cases." (Citations omitted.)

*Id.* at 96, 43 A.2d at 185. *See Foard v. Snider, supra.*

In at least one relevant out-of-state case involving the interpretation of the term "current market value," the Court's grant of specific performance was based, in part, on a holding that "the law recognizes in the area of enforceability of contracts the maxim, *'id certum est quod certum reddi potest'* (that is certain which can be made certain)." *Portnoy v. Brown, supra,* 243 A.2d at 447; and in *Shayeb v. Holland,* 321 Mass. 429, 73 N.E.2d 731 (1947), the court granted specific performance where an option clause to purchase real estate contained no reference whatsoever to the price. The Supreme Judicial Court of Massachusetts there stated:

> "It is true that the option in question does not in terms provide for the determination of the price by any subsequent agreement. We think that the offer to sell in the present case should be reasonably understood to be an offer to sell for a fair and reasonable price. Otherwise, the offer would have no practicable value but would be a mere illusion or perhaps a snare to the unwary. In somewhat similar situations, the provisions in leases for a renewal of the term or for a sale of the demised premises have been held to imply a fair rental or price."

73 N.E.2d at 733.

In the instant case, the option clause does not specify a sale price, nor does it provide that the property be measured by "current market value," "reasonable value" or other similar terms. In our view, however, there is no just reason for an approach to the issue in this case different from that manifested in the cases previously cited. Here, the price "arrived at by three independent realty appraisers" would

perforce be the fair market value of the property at the time the option was to be exercised. *See generally,* Annot., 167 A.L.R. 727 (1947); 71 Am. Jur. 2d Specific Performance § 40 (1973); 5A A. Corbin, *Contracts* § 1174 (1964). *But see Griffith v. Frederick County Bank,* 6 G & J 424 (1834); *Milnes v. Gery,* 14 Ves Jr 400, 33 Eng Reprint 574, 6 Eng Rul Cas 684 (1807). The option clause itself, therefore, provided a practical method by which the price could be determined; and it should not be overlooked that the understanding of the parties, according to the uncontradicted testimony of Mrs. Hanna, was that the *average* of the three appraisals would be determinative.[6]

We do not think that the absence of a specified method by which the appraisers were to be selected is critical. In this respect, the suggestion made by the Hannas' counsel in his letter dated February 13, 1978, that each of the parties select an appraiser, and the two thus chosen select a third, was in accordance with time-honored practice. On remand, the court is free to prescribe the method by which the appraisers are to be selected — either by the parties themselves or by the court, in its own discretion.

### III

It follows that the judgment in the amount of $28,800 against the appellants for rent due from June 1, 1978 through May 31, 1980 should be stricken. The relationship of the parties, upon the termination of the lease on May 31, 1978 and the exercise of the option, became that of vendor-vendee and rent was no longer due. *Young v. Cities*

---

**6.** There is present here no issue concerning financing or the terms of the financing. *Cf.* Imas Gruner & Associates, Ltd. v. Stringer, 48 Md. App. 364, 427 A.2d 1038 (1981).

*Service Oil Co.,* 33 Md. App. 315, 319-20, 364 A.2d 603, 606. (1976).

> *Decree dismissing appellants' amended bill of complaint reversed; judgment for appellee in the amount of $28,800 reversed; case remanded for further proceedings consistent with this opinion; costs to be paid by appellee.*